1
2
3
4
5          **IN THE UNITED STATES DISTRICT COURT**
6              **FOR THE DISTRICT OF ARIZONA**
7

8    United States of America,              )
                                            )    No. CR-11-1823-TUC-DCB (JR)
9          Plaintiff,                       )
                                            )    **REPORT AND RECOMMENDATION**
     v.                                     )
10                                          )
     Jeffery Allen Stout,                   )
11                                          )
           Defendant.                       )
12   _____       )

13          Pending before the Court is a Petition to Revoke Supervised Release (Doc. 32) filed

14   on February 14, 2012.  Defendant's Evidentiary Hearing occurred before Magistrate Judge

15   Rateau on October 31, 2012.[1]  Defendant was present and assisted by counsel. The

16   Government presented three witnesses and admitted eight exhibits into evidence. (Tr. 33

17   (admission of exhibits).) The Defendant also testified.  For the reasons explained below, the

18   Court recommends that the District Court find that the Defendant did not violate the terms

19   of his supervised release.

20   **I.     BACKGROUND**

21          On June 17, 2011, Defendant pled guilty to one count of Bank Fraud in violation of

22   18 U.S.C. § 1344 (Doc. 18).    On September 26, 2011, the District Court sentenced

23   Defendant to 12 months in prison, with credit for time served, followed by 3 years of

24   supervised release (Doc. 25).  His term of supervised release began to run on January 20,

25   2012, when he was released from prison, and was set to expire on January 19, 2015 (Doc.

26   32).

27   _____

28          [1]A transcript of the hearing was ordered and prepared (Doc. 45).  The transcript of the October 31,
     2012 proceedings is identified herein as "Tr."

At the time he was sentenced on the federal charge, Defendant also had a charge pending against him in Pima County Superior Court for Second Degree Burglary, in violation of A.R.S. § 13-1507. (Tr. 31-32; Exhibit 4.)  While in federal custody, the Defendant pled guilty in that case and, on November 17, 2011, was sentenced to three years intensive probation. (Tr. 5-6, 46; Exhibit 4 (Sentencing Minute Entry).)  Judge Leonardo ordered that the sentence run concurrent to the Defendant's federal sentence and specifically noted that:

> the defendant's actual supervision on IPS in this matter will occur only if the defendant's Federal matter has been completed, the remaining balance, if any, of this sentence will then commence and the defendant will be placed on IPS probation at that time.

(Exhibit 4 (sentencing Minute Entry), p. 2.)

After his release from federal custody, the Defendant did not report to a Residential Reentry Center, left Arizona and went to Indiana.  On February 14, 2012, Defendant's Probation Officer filed a Petition to Revoke Supervised Release alleging violations of the following conditions:

> Standard Condition No. 2: You shall not leave the judicial district or other specified geographic area without the permission of the Court or probation officer.

> Special Condition No. 7: You shall reside and participate in a Residential Re-entry Center for up to 180 days, unless discharged earlier by the probation officer.

On August 6, 2012, the Defendant was arrested in Indiana and returned to Arizona. (Doc. 34.)

## II.    EVIDENTIARY HEARING

In mid-January 2012, the Defendant was serving his sentence on the federal Bank Fraud conviction when he asked a correction officer when he would be released.  He was told that his scheduled release date was April 20, 2012. (Tr. 47.)  However, a few days later on Friday, January 20, 2012, the Defendant was told to pack his belongings because he was being released. (*Id.*)  After sitting in the holding area of the prison, he was released at 5:00 p.m. (*Id.*)  Wearing the clothes he had been arrested in, even though he had gained 70

pounds in prison, and shower shoes, and without any money, the Defendant was released out the door and walked toward the road while being followed by a truck driven by a security guard.  (Tr. 47-48.)  Once in Florence, the Defendant called his mother collect from a Chevron gas station.  (Tr. 48.)  He suggested that they get him a motel room and he went to the Blue Mist Hotel and arranged for his mother to fax them her credit card information.  (*Id.*)

The Defendant's mother paid for three nights lodging and then the Defendant asked his sister to pay for a fourth, Monday night, because he could not contact his probation officer until Monday, January 23, 2012. (Tr. 49.) On Monday morning, the defendant found somebody to loan him a cell phone, and he called his probation officer, Kathleen Nunez.  He told her that he had been released from CCA without any money or a place to go, and that his mother was paying for him to stay at the Blue Mist Hotel in Florence, Arizona.  (Tr. 24-25, 49-50.)  Officer Nunez sought to assist the Defendant in finding someplace to stay and later called him back in his hotel room and told him that he could be placed in a halfway house but first she would need him to execute a Waiver and Order.  (Tr. 25, 51.)  Officer Nunez explained that the Waiver and Order was necessary because she needed "judicial approval to place him in a halfway house setting" and that the Defendant would need to "agree to have an extra special condition imposed so that [she] could facilitate his placement."  (Tr. 27; 33.)

That same day, Officer Nunez contacted Aaron Smith, the assistant program director at Behavioral Systems Southwest ("BSSW"), a federal reentry center, or "halfway house," located in Florence, Arizona that offers drug and alcohol classes, job search and housing assistance.  (Tr. 12.)  Officer Nunez told Mr. Smith she had "a tough situation," and explained that the Defendant, who had then been released from custody from the nearby CCA facility on January 20, 2012, was "basically homeless" and staying at the Blue Mist Hotel in Florence.  (Tr. 12-13; 20.)  Officer Nunez asked Mr. Smith if there was available bed space at BSSW and if they would be willing to accept Defendant on such short

1   notice.(Tr. 12.)   Mr. Smith told Officer Nunez that BSSW would have a bed available on

2   January 25 (the following Wednesday).  Then, using emergency (or "second chance") funds,

3   Officer Nunez secured an extra night's lodging for the Defendant at the Blue Mist Hotel.

4   (Tr. 13, 25-26; Exhibit 1 (Second Chance Act request).)  However, the Defendant was not

5   aware that Officer Nunez paid for an additional night.  (Tr. 52-53.)

6           At Officer Nunez's request, Mr. Smith from BSSW went to meet the Defendant at the

7   Blue Mist Hotel and had him sign the waiver portion of the Waiver and Order in which he

8   waived his right to a hearing and agreed to the modification of his conditions of supervised

9   release to add Special Condition 7, the requirement that he reside in a residential reentry

10   center for 180 days. (Tr. 13-14; Tr. 26; Doc. 31 (Waiver and Order).)  When Mr. Smith met

11   the Defendant at the hotel, he explained that the waiver and order meant that:

12                   Basically, that he would be with us at our facility for 180 days,
                     could be discharged earlier based on several factors that his
13                   probation officer would determine. I told him we'd help him get
                     an ID, social security card, employment. He'd have housing and
14                   – and meals provided to him . . . .

15   (Tr. 16.)  The Defendant signed the Waiver and Order and Mr. Smith told him to report to

16   the BSSW facility the following day, January 24, 2012, and told him how to get there. (Tr.

17   16-17.)

18           The following morning, on January 24, 2012, the Defendant talked to his mother

19   about returning to his home state of Indiana. (Tr. 53.)  She told him he had a home, children

20   and a job there, and offered to buy him a ticket home. (*Id*.)  The Defendant, not having eaten

21   since his release on January 20 and not knowing where he was going to stay that night,

22   decided to leave Florence and return home to Indiana. (Tr. 38-39, 50, 52.)  That same day,

23   Officer Nunez received a voice message from the Defendant indicating that he was going to

24   Indiana. (Tr. 28.)  She then called BSSW and confirmed that the Defendant had not reported

25   to the facility.  (Tr. 27.)

26           The Defendant then set-out hitchhiking toward Tucson. (Tr. 54.) However, while on

27   the highway near Casa Grande, a police officer pulled over to tell him that he could not

28                                            - 4 -

1   hitchhike on the highway. (Tr. 54-55.) The officer ran his Arizona license and then drove
2   the Defendant to the Greyhound bus station in Casa Grande. (Tr. 55.) He contacted his
3   mother from the bus station and she purchased him a ticket to Indiana. (*Id*.) During this
4   time, between January 28 and 30, 2012, the Defendant called Officer Nunez and left
5   messages telling her that he was going to Indiana to live with family in Star City, Indiana.
6   (Tr. 28, 53-54.)

7          Upon arriving in Indiana on January 30, 2012, the Defendant learned that Officer
8   Nunez was trying to contact him and had left her cell phone number. (Tr. 55-56.) He
9   returned her call and Officer Nunez told him that she could charge him with absconding, but
10  that she understood his situation and would attempt to get his supervision transferred to
11  Indiana. (Tr. 28-29, 56.) In the meantime, Officer Nunez requested that the Defendant call
12  and leave a message at her office number with his current address and phone number, which
13  he did. (Tr. 56.) The Defendant then started working in Indiana as a welder. (Tr. 57.)
14  During that period, he recalls his father telling him about a conversation with the Defendant's
15  parole officer indicating that they were trying to get his supervision transferred to Indiana.
16  (*Id*.) However, after another month or so, the Defendant phoned Officer Nunez and left a
17  message letting her know that he was doing well and inquiring about the supervision transfer.
18  (*Id*.) He did not hear back from her, and a short time later, after living in Indiana for
19  approximately 8 months and being gainfully employed, the Defendant was pulled over for
20  a burned out headlight and arrested on a warrant issued because he left Arizona without the
21  necessary permission. (Tr. 58.)

22         As Officer Nunez explains, while the Defendant was in Indiana, she called the federal
23  probation office for the Southern District of Indiana and requested they take "courtesy
24  supervision" of Defendant's case. (Tr. 29.) However, the Indiana office declined because
25  the Defendant had "pending criminal matters in the District of Arizona and they wanted him
26  to address those first." (*Id*.) As Officer Nunez understood it, the criminal matter of concern
27  to the Indiana office was the charge against Defendant in Pima County Superior Court for

28

1  Second Degree Burglary, in violation of A.R.S. § 13-1507.  (Tr. 31-32; Exhibit 4.)[2]  The

2  Defendant had pled guilty in that case and, on November 17, 2011, was sentenced to three

3  years of intensive probation.  (Tr. 5-6; Exhibit 4 (Sentencing Minute Entry).)  Without

4  informing the Defendant that the Indiana office declined to accept supervision or that she

5  intended to obtain a warrant for his arrest, on February 14, 2012, Officer Nunez requested

6  a warrant for the Defendant's arrest. (Tr. 32, 41.)  The Defendant first became aware of the

7  existence of the warrant on August 6, 2012, when he was arrested in Indiana.  (Tr. 58.)

8  **III.    FINDINGS OF FACT AND CONCLUSIONS OF LAW**

9         A court may revoke a defendant's supervised release if it finds by a preponderance of

10  the evidence that the defendant violated a condition of his supervised release. *United States*

11  *v. Musa*, 220 F.3d 1096, 1100 (9th  Cir.), *cert. denied*, 531 U.S. 999, 121 S.C. 498, 148

12  LED.2d 469 (2000); *see also* 18 U.S.C. § 3583(e)(3).  The Federal Rules of Evidence do not

13  apply to a revocation hearing.  Fed.R.Evid. 1101(d)(3); *United States v. Martin*, 984 F.2d

14  308, 310-11 (9th Cir.1993).  Based on these standards, the Court finds that the government

15  has not established by a preponderance of the evidence that the Defendant violated the

16  conditions of his supervised release.

17         The revocation petition in this case was born out of a series of events, some based on

18  good intentions others not, that placed the Defendant in circumstances that were variously

19  precarious and vague.  First, the process and planning for his release by CCA was utterly

20  ridiculous.  The Defendant was informed of his release a mere four hours prior and then was

21  sent penniless into the streets of Florence, Arizona at 5:00 p.m. on a Friday, wearing shower

23  [2]A bench warrant for the Defendant's arrest was issued on September 14, 2012.  (Tr. 31; Exhibit 3.)  The warrant was issued for Defendant's failure to appear on charges of Possession of Marijuana, in violation of A.R.S. § 13-3405(A)(1), and Possession of Drug Paraphernalia, in violation of A.R.S. § 3415(A), both Class 6 felonies.  (Exhibit 3.)  Although not entirely clear from the testimony, it appears that the warrant was issued in error as the Defendant previously pled guilty to these charges and was sentenced to six months non-reporting probation.  (Tr. 60, 78.)  Since the hearing, Defense counsel informed the Court that the Defendant was transported to Pinal County to address the warrant and was told there were no warrants were outstanding.

1   shoes and clothes that were several sizes too small.  To his credit, he was able to arrange two

2   nights lodging through his mother and another through his sister, so he could make it until

3   Monday when he could contact his probation officer.

4        Although he went without food all weekend (Tr. 38-39), he was able to contact

5   Officer Nunez about his situation on Monday.  To her credit, she sought out accommodations

6   for him and told Mr. Smith from BSSW that the Defendant was in a "tough situation" and

7   was "basically homeless."  Thus, when Mr. Smith went to the Blue Mist Hotel to meet the

8   Defendant, he had not eaten and had no prospects for shelter.  Not surprisingly given the

9   circumstances, the Defendant agreed to add an "extra special condition" to his conditions of

10  supervision that required him to reside an additional 180 days in a halfway house.  As the

11  Defendant stated, he signed the waiver because he "just wanted a place to stay."  (Tr. 75.)

12       Although Mr. Smith indicated that the Defendant would have been admitted to the

13  facility on January 24, both the paperwork and Officer Nunez indicated that the space would

14  only be available on January 25. (Tr. 17, 25, 27.)  The Defendant also admits he should have

15  reported to BSSW. (Tr. 74).  But by January 24, he had not eaten in five days and felt he had

16  "nowhere to go."  (*Id.*)  After being convinced by his mother to leave for Indiana, the

17  Defendant left several messages telling Officer Nunez of his intentions.

18       Although the foregoing events largely explain why the Defendant elected to leave, it

19  was his next conversation with Nunez that is of the greatest legal significance.  After he

20  arrived in Indiana, he called Officer Nunez who told him that she understood his situation

21  and would attempt to get his supervision transferred to Indiana.  Both of the conditions the

22  Defendant is accused of violating provide for exceptions with the approval of his probation

23  officer.  Under Standard Condition No. 2, the Defendant could leave Arizona with the

24  permission of Officer Nunez and under Special Condition No. 7, she could also  discharge

25  him from BSSW.  "A probation officer's instructions are relevant to whether a supervised

26  release condition gives fair warning of prohibited conduct."  *United States v. King*, 608 F.3d

27  1122, 1128-29 (9th Cir. 2010); *United States v. Romero*, 676 F.2d 406, 407 (9th Cir. 1982)

28

1  ("In addition to the bare words of the probation condition, the probationer may be guided by

2  the further definition, explanations, or instructions of the district court and the probation

3  officer."). Here, given that Officer Nunez did not act or threaten to seek revocation based

4  on the Defendant's departure, but instead was seeking a transfer of supervision to Indiana,

5  the Defendant was understandably under the impression that the conditions he is accused of

6  violating were waived and that his conduct was no longer prohibited.

7       Additionally, despite knowing where the Defendant was and, based on previous

8  contacts, that he was fully cooperative, Officer Nunez never told the Defendant that Indiana

9  was not going to accept the transfer of his supervision or that it was necessary for him to

10 return to Arizona. (Tr. 58.)  Even Officer Nunez admits that the Defendant may have been

11 under the impression that she was still trying to get him transferred. (Tr. 41).  Due process

12 requires that a defendant be given fair warning before he is subjected to a forfeiture of his

13 liberty for engaging in non-criminal activities. *United States v. Dane*, 570 F.2d 840, 844 (9th

14 Cir. 1977).   While the written conditions of his release would typically suffice in giving

15 notice to the Defendant that he was in violation of the terms of his release, *see United States*

16 *v. Ortega-Brita*, 311 F.3d 1136, 1138 (9th Cir. 2002), Officer Nunez apparent acquiescence

17 to his departure rendered that notice ambiguous.  Once she allowed him to stay in Indiana

18 and indicated that she would work to get his supervision transferred, fair warning required

19 that she also inform the Defendant that she intended to violate him and petition for revocation

20 of his supervised release.  The undisputed facts establish, however, that the first time the

21 Defendant became aware of the alleged violations was when he was pulled-over in Indiana

22 for a minor traffic infraction.  Again, had he the notice and opportunity to voluntarily address

23 the alleged violations, the evidence suggests he would have.

24      The Government also suggests that the Defendant left Arizona in violation of the state

25 court probation. (Tr. 31-32.)  If he did, it would be significant because it would provide an

26 additional basis for limiting his travel outside Arizona and it would provide a legitimate basis

27 for Indiana's refusal to accept the transfer of supervision.  However, a review of the state

28

court record supports the Defendant's understanding of his state court sentence and indicates that the Indiana probation office was wrong about the Defendant's status in Arizona.

The Defendant explained his understanding of his state sentence as follows:

> the stipulation which my lawyer made sure he stated with Judge Leonardo was that I would go under the guidelines for the federal probation, that they would just – they being would – what they – the way they made it sound to me was they were putting my probation on the federal because I had already gotten three years of federal probation. I was already sentenced to three years federal probation. And they basically stated that being that I was already on three years supervised release, that I would go under the terms of the supervised release of the federal government.

(Tr. 61-62.) Although the Government disagrees, the Defendant's understanding of the sentence is entirely consistent with the state court record. In sentencing the Defendant in state court, Superior Court Judge Leonardo expressly stated that the Defendant's state supervision would commence "only if the defendant's Federal matter has been completed," and only if there was a "remaining balance." (Exhibit 4, p. 2.) Although more eloquently put, that is precisely how the Defendant understood the sentence. Under the court's order, the Defendant was to follow the requirements of the Federal release and commence state supervision only if there was a remaining balance of state time after the Federal supervision ended. Nothing in the record indicates that he violated these requirements.

The Supreme Court has noted that the revocation of parole is the "last resort" when treatment has failed or is about to fail. *Gagnon v. Scarpelli*, 411 U.S. 778, 785 (1973). Here, by all accounts, the Defendant was succeeding on parole while in Indiana. Were it not for the confusion associated with the state court proceedings, which led to Indiana's refusal to accept transfer of his supervision, he very well could be continuing in his success. Alternatively, if he had been warned of the intention of the parole officer to petition for revocation, there is no indication that he would not have cooperated by returning to Arizona. Accordingly, the preponderance of the evidence indicates that the Defendant did not violate the terms of his supervised release.

## IV.     RECOMMENDATION FOR DISPOSITION BY THE DISTRICT COURT JUDGE

Based on the foregoing and pursuant to 28 U.S.C. § 636 (b) and Local Rule 1.7(d)(2), Rules of Practice of the United States District Court, District of Arizona, the Magistrate Judge **RECOMMENDS** that the District Court, after an independent review of the record, find by a preponderance of the evidence that the Defendant did not violate Standard Condition No. 2 (Allegation A) or Special Condition No. 7 (Allegation B) of the conditions of supervised release.

Pursuant to 28 U.S.C. § 636 (b), any party may serve and file written objections with the District Court within fourteen (14) days of being served with a copy of this Report and Recommendation.  If the objections are not timely filed they may be deemed waived.  If any objections are filed, this action should be designated with the following case number **CR 11-1823 - TUC - DCB**.

DATED this 13th day of November, 2012.


Jacqueline M. Rateau
United States Magistrate Judge

- 10 -